*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-0397

ANIMAL LEGAL DEFENSE FUND, APPELLANT,

V.

HORMEL FOODS CORP., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-4744-16)
(Hon. Anthony C. Epstein, Trial Judge)

(Argued June 30, 2020                    Decided September 2, 2021)

*David S. Muraskin*, with whom *Kelsey Eberly*, of the bar of the State of California, *pro hac vice*, by special leave of court, was on the brief, for appellant.

*Aaron D. Van Oort*, of the bar of the State of Minnesota, *pro hac vice*, by special leave of court, with whom *Frank S. Swain*, *Tyler A. Young*, of the bar of the States of Massachusetts and Minnesota, *pro hac vice*, by special leave of court, and *Martin J. Demoret*, of the bar of the States of Iowa and Nebraska, *pro hac vice*, by special leave of court, were on the brief, for appellee.

*Allison M. Zieve* and *Scott L. Nelson* filed an *amicus curiae* brief for Public Citizen Litigation Group in support of appellant.

*Cheryl Leahy*, *Sarah Hanneken*, and *Wendy Watts* filed an *amicus curiae* brief for Animal Outlook f/k/a Compassion Over Killing, Animal Equality, and The Humane League in support of appellant.

*Craig L. Briskin* filed an *amicus curiae* brief for National Consumers League in support of appellant.

*Katherine Campbell*, *Robert George*, of the bar of the States of Arkansas and Oklahoma, *pro hac vice*, by special leave of court, and *Kathy McCarroll*, of the bar of the State of Arkansas, *pro hac vice*, by special leave of court, filed an *amicus curiae* brief for The North American Meat Institute, American Association of Meat Processors, National Pork Producers Council, Grocery Manufacturers Association, National Chicken Council, National Turkey Federation, and Southwest Meat Association in support of appellee.

Before THOMPSON, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: The Animal Legal Defense Fund sued Hormel Foods in connection with meat products it advertises as "Natural Choice." ALDF claims the ads are misleading in violation of the District of Columbia's Consumer Protection Procedures Act. *See* D.C. Code §§ 28-3901 *et seq*. (2013 Repl.). In its view, the ads falsely convey to consumers that the animals were treated humanely and that the products are free from preservatives. The D.C. Superior Court granted summary judgment in Hormel's favor, finding that ALDF lacked standing to bring suit. Despite finding a lack of standing, the court proceeded to address the merits, concluding that ALDF's claims were preempted by federal laws regulating the labeling of meat and poultry products.

ALDF now brings this appeal. It argues: (1) contrary to the trial court's ruling, the Consumer Protection Procedures Act, or CPPA, modifies Article III standing requirements with a statutory test that it satisfies; (2) in any event, it had Article III

standing under the "organizational standing" doctrine; and (3) its claims are not preempted by federal law.

We agree with ALDF on its first point. The CPPA confers standing upon "public interest organization[s]" bringing suit "on behalf of the interests of a consumer or a class of consumers," so long as they have a "sufficient nexus" to "adequately represent those interests." D.C. Code § 28-3905(k)(1)(D). That recent addition to the CPPA conveys a clear legislative intent to modify Article III's strictures with a statutory test governing public interest organizations' standing to bring a CPPA claim. Because ALDF meets that statutory test, it has standing to sue without regard to whether it also satisfies traditional Article III standing requirements. Our agreement with ALDF on its first argument renders it unnecessary to address its second, so we do not resolve it. As to the third question, we conclude that federal labeling laws do not preempt ALDF's claims, which attack only Hormel's advertisements beyond its product labels (and not the labels themselves). We reverse the trial court's judgment and remand for further proceedings.

**I.**

ALDF is a nonprofit organization whose core mission is to "protect the lives and advance the interests of animals through the legal system." It advances that objective through a variety of strategies, including legal advocacy and public outreach related to animal welfare. Important here, ALDF fulfills its mission, in part, by trying to ensure consumers are provided with accurate information about the treatment of animals raised for consumption so as to reduce demand for factory-farmed products. Factory farming, as ALDF describes it, "involves packing animals into cramped, unsanitary settings, in many cases so small the animals are barely able to move."

Hormel produces and sells food products containing meat and poultry. In 2006, it launched its Natural Choice® line of deli meats, which include beef, ham, turkey, and chicken products. Before they hit the market, Hormel was required by law to submit proposed labeling to the U.S. Department of Agriculture for approval. It did so, and the USDA approved labels describing Hormel's Natural Choice meat products as "Natural," "All Natural," "100% Natural," and containing "No Preservatives." Nine years later, the company launched its "Make the Natural Choice" advertising campaign. The campaign included print and video ads that, like

the products' labels, described Natural Choice deli meats as "100% natural," "all natural," with "no [added] preservatives." The ads also used descriptors like "clean," "honest," "higher standards," and "wholesome."

Shortly after Hormel began its campaign, ALDF discovered that the pigs slaughtered to make Hormel products had been subjected to what it describes as "egregious and stomach-churning" treatment. It made that discovery while covertly investigating a pig-breeding facility it later identified as a Hormel supplier. ALDF lobbied the USDA to prohibit use of the term "natural" on the labels of all meat and poultry products that are factory-farmed—a particularly inhumane and unnatural means of animal husbandry, in its view. According to ALDF, the descriptor trades on consumers' mistaken beliefs that meat products described as natural are sourced from humanely raised livestock. It specifically identified Hormel's Natural Choice deli meats as misleading consumers in that way, despite the USDA's approval of their labeling. ALDF later published its advocacy efforts online, along with the findings from its covert investigation. ALDF also engaged in other advocacy it maintains was, at least in part, undertaken to combat Hormel's Natural Choice campaign. It lobbied against a regulation proposed by the USDA concerning a pig slaughter inspection program, and it continued to challenge so-called "Ag-Gag"

laws—prohibiting undercover investigations of agricultural facilities[1]—as it had done since 2011.

In addition to its advocacy efforts, ALDF sued Hormel in the D.C. Superior Court, alleging its advertising campaign violated the CPPA. *See* D.C. Code § 28-3904 (making it unlawful for "any person to engage in an unfair or deceptive trade practice"). The crux of its complaint is that Hormel's Natural Choice campaign misleads consumers into believing that the animals slaughtered to make Natural Choice deli meats were treated humanely, even though they were not. The ads also tout the absence of preservatives and nitrates, even though the meats contain naturally-occurring nitrates from celery juice and cherry juice powder. ALDF sought declaratory and injunctive relief, but no monetary damages. In particular, it asked for a judicial declaration that Hormel's "Make the Natural Choice" ads violate the CPPA, and it called for cessation of those ads and "corrective advertising."

The parties cross-moved for summary judgment, and the trial court granted Hormel's motion. It concluded ALDF lacked standing to sue under the CPPA. It

---

[1] *See, e.g.*, Iowa Code § 717A.3A (2012) (held unconstitutional in part in *Animal Legal Def. Fund v. Reynolds*, No. 19-1364, 2021 WL 3504493, at *2-5 (8th Cir. Aug. 10, 2021)).

also concluded that ALDF's claims were preempted by federal labeling laws—namely, the Federal Meat Inspection Act and the Poultry Products Inspection Act. ALDF now appeals, challenging those rulings.

## II.

The threshold question on appeal is whether ALDF has standing to maintain its suit under the CPPA. In ruling on the cross-motions for summary judgment regarding standing, the trial court rejected ALDF's argument that it had standing as a matter of law and granted Hormel's motion, concluding that ALDF lacked standing. We review those legal determinations de novo. *Aziken v. District of Columbia*, 194 A.3d 31, 34 (D.C. 2018). Standing analysis "is different at the successive stages of litigation." *Grayson v. AT&T Corp.*, 15 A.3d 219, 232 (D.C. 2011) (en banc) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). At the summary judgment stage, standing (or lack thereof) is established if, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *Johnson v. Washington Gas Light Co.*, 109 A.3d 1118, 1120 (D.C. 2015).

ALDF asserts on appeal, as it did in opposing summary judgment, that it has standing under two distinct theories. First, it argues that it has so-called "representational standing" under D.C. Code § 28-3905**(k)(1)(D)**, a provision it maintains modifies traditional Article III standing requirements with a statutory test, which it satisfies. The trial court rejected both facets of that argument, concluding subsection (k)(1)(D) did not modify traditional Article III standing requirements and that ALDF did not satisfy the statutory prerequisites to standing in any event. Second, regardless of that statutory argument, ALDF argues it satisfies traditional Article III standing requirements under a theory of "organizational standing," so that it may independently proceed under § 28-3905**(k)(1)(C)**.

## A.

ALDF claims it has representational standing under CPPA provision § 28-3905(k)(1)(D). The parties disagree about three big-picture points critical to that argument. First is whether § 28-3905(k)(1)(D) modifies Article III standing requirements with a statutory test applicable to public interest organizations. If it does, the second issue is whether ALDF meets that statutory test for standing. Finally, Hormel contends that even if we answer both of those questions in the

affirmative, ALDF forfeited any claim to standing under this provision by failing to specifically identify it in its complaint. ALDF has the better of each argument.

**1.**

The District of Columbia's local courts, "established by Congress pursuant to Article I, are not [constitutionally] bound by the requirements of Article III." *District of Columbia v. Walters*, 319 A.2d 332, 338 n.13 (D.C. 1974); *see also Rotunda v. Marriott Int'l, Inc.*, 123 A.3d 980, 987 (D.C. 2015); *District of Columbia v. Grp. Ins. Admin.*, 633 A.2d 2, 12 (D.C. 1993). Our courts nonetheless generally follow Article III's guidance to adjudicate only "cases" or "controversies"—as implemented via standing doctrine—albeit "for prudential reasons." *Fraternal Order of Police v. District of Columbia*, 113 A.3d 195, 199 (D.C. 2015). We do so in recognition of the sound judicial policy "that an adversary system can best adjudicate real, not abstract, conflicts." *Grayson*, 15 A.3d at 233 (citation omitted). But that prudential judgment is subject to legislative override, and nobody "questions the [D.C.] Council's authority to remove prudential limits on standing." *Id.* at 259 (Ruiz, J., concurring in part and dissenting in part).[2]

---

[2] *Cf. Stockmeier v. Nevada Dep't of Corr. Psychological Rev. Panel*, 135 P.3d 220, 225 (Nev. 2006) ("State courts are free to adopt a 'case or controversy'

The question is whether the CPPA, through certain 2012 amendments detailed below, did in fact alter Article III's standing requirements. We have previously confronted a similar question when interpreting the 2000 amendments to the CPPA, answering in the negative. *See Grayson*, 15 A.3d at 229. The CPPA's original enactment permitted suits to be brought by "[a]ny consumer who suffers any damage as a result of . . . a trade practice." D.C. Code § 28-3905(k)(1) (1976). That provision was amended in 2000 to permit suits by: "[a] person,[3] whether acting for the interests of itself, its members, *or the general public* . . . seeking relief from the use by any person of a trade practice." D.C. Code § 28-3905(k)(1) (2001) (emphasis added); *Grayson*, 15 A.3d at 236.

_____

justiciability requirement or open their courts to lawsuits that may not meet this requirement."); *Hawkeye Bancorporation v. Iowa Coll. Aid Comm'n*, 360 N.W.2d 798, 802 (Iowa 1985) ("Unlike the federal courts, state courts are not bound by constitutional strictures on standing. With state courts, standing is a self-imposed rule of restraint."); *Life of the Land v. Land Use Comm'n*, 623 P.2d 431, 436-41 (Haw. 1981) (Article III standing requirements do not apply to state courts); *Carpenter v. Suffolk Franklin Sav. Bank*, 346 N.E.2d 892, 895 (Mass. 1976) ("State courts need not become enmeshed in the [f]ederal complexities and technicalities" involving standing); *Ohio Roundtable v. Taft*, 773 N.E.2d 1113, 1121 (Ohio Ct. Com. Pl. 2002) ("[T]he federal decisions in this area are not binding upon this court, and we are free to dispense with the requirement for injury where the public interest so demands.").

[3] A "person" was defined as including "an individual, firm, corporation, partnership, cooperative, association, or any other organization, legal entity, or group of individuals however organized." *Id.* § 28-3901(a)(1) (2001).

A division of this court, in *Grayson*,[4] endorsed the view that those 2000 amendments jettisoned Article III standing requirements. But we revisited the issue en banc and ultimately rejected that position. *Grayson*, 15 A.3d at 238. We reasoned that "[e]limination of our constitutional standing requirement would be so unusual" that we would not "lightly infer such intent on the part of the Council" absent a clear expression—from the text and "context of the legislative and drafting history"—to do so. *Id.* at 238, 243-44. Finding no "mention of this court's constitutional standing requirement" in the legislative record, and no sufficiently clear intent to dispense with it in the statutory text or enactment history, we concluded there was no "clear expression of an intent by the Council to eliminate our constitutional standing requirement." *Id.* at 243-44.

The year after we decided *Grayson*, the Council once again amended the CPPA in 2012. Most relevant here, it enacted two new subsections, §§ 28-3905(k)(1)(C) and (k)(1)(D). Subsection (k)(1)(C) permits any nonprofit organization to bring a suit so long as it is, at least in part, "on behalf of itself or any

---

[4] *See Grayson v. AT&T Corp.*, 980 A.2d 1137, 1154 (D.C. 2009), *opinion vac'd*, 15 A.3d 219 (D.C. 2011) (en banc).

of its members." The parties agree that the Council did not displace Article III's requirements in this subsection, so they continue to apply to actions brought under (k)(1)(C).[5] But subsection (k)(1)(D) excises the requirement that the suit be brought on behalf of the organization or its members, and it applies only to a particular subset of nonprofit organizations: "public interest organization[s]." Those are defined as "nonprofit organization[s] . . . organized and operating, in whole or in part, for the purpose of promoting interests or rights of consumers." D.C. Code § 28-3901(a)(15). Such public interest organizations are empowered to bring suits "on behalf of the interests of a consumer or a class of consumers" without pursuing any independent interest of the organization or its members. Subsection (k)(1)(D) provides:

> (i) Subject to sub-subparagraph (ii) . . . a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an

---

[5] Amicus Curiae National Consumers League suggests that (k)(1)(C) abrogated Article III standing requirements. That argument is in tension with *Grayson* itself, construing nearly identical language to incorporate "constitutional standing requirement[s]." 15 A.3d at 236, 245. It is also at odds with the unique function the Council carved out for the subset of nonprofit organizations ("public interest organizations") that promote the rights of consumers in (k)(1)(D), as discussed further below. We agree with the parties that Article III standing principles continue to apply to organizations bringing suit under (k)(1)(C), a route available to the universe of nonprofit organizations and not just those public interest organizations authorized to bring suit under (k)(1)(D).

> action [in their own capacity] for relief from such use by
> such person of such trade practice.
>
> (ii) An action brought under sub-subparagraph (i) of this
> subparagraph shall be dismissed if the court determines
> that the public interest organization does not have
> sufficient nexus to the interests involved of the consumer
> or class to adequately represent those interests.

D.C. Code § 28-3905(k)(1)(D).

The limitations to bringing suit under this provision reveal the Council's intent to modify traditional Article III standing requirements with the above statutory test. Those statutory limitations are threefold: (1) rather than permitting any person or legal entity to bring suit, (k)(1)(D) applies only to those nonprofits organized and operating, at least in part, on behalf of consumers; (2) the consumer or class of consumers must be capable of bringing suit in their own right; and (3) the public interest organization must have a "sufficient nexus to the interests involved of the consumer or class . . . to adequately represent those interests." D.C. Code § 28-3905(k)(1)(D). That evinces a plain legislative intent to account for core standing concerns—i.e., "[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution," *Sierra Club v. Morton*, 405 U.S. 727, 731 (1972)—while modifying Article III's doctrinal requirements with a more expansive statutory test.

Two additional points make that intent particularly clear. First, (k)(1)(D) would be pointless if it incorporated Article III's restrictions. Recall that (k)(1)(C) already expressly empowers a nonprofit organization to bring suit on behalf of itself or its members, so that if (k)(1)(D) were likewise interpreted as incorporating that requirement, it would serve no independent function. Hormel's reading would leave (k)(1)(D) as imposing three *additional* restrictions to nonprofits bringing suit— outlined in the previous paragraph, *supra*—so that it would never make sense for nonprofits to bring a (k)(1)(D) suit when they might sidestep those additional barriers through a (k)(1)(C) suit. That would violate the "basic principle" of statutory interpretation that "each provision of the statute should be construed so as to give effect to all of [its] provisions, not rendering any provision superfluous."[6] *Grayson*, 15 A.3d at 238 (quoting *Tangoren v. Stephenson*, 977 A.2d 357, 360 n.12 (D.C. 2009)). It would also contravene the maxim that where the legislature implements a significant change in language, as it did when it created (k)(1)(D), courts presume a significant change in meaning. *See In re M.M.D.*, 662 A.2d 837,

---

[6] That would also be a perverse result. It would mean that the D.C. Council put more restrictions on public interest organizations bringing suit despite the fact that they are the subset of nonprofit organizations "organized and operating," at least in part, "for the purpose of promoting interests or rights of consumers." The organizations most vested in protecting consumer interests would be the least empowered to bring suit (except that they too can proceed under (k)(1)(C)).

847 n.11 (D.C. 1995) (collecting authorities); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*, 256 (2012).

Second, the legislative history—far from being silent as it was with the 2000 amendments interpreted in *Grayson*, 15 A.3d at 243-44—makes the Council's intent to modify Article III requirements clear.  A report from the Council's Committee on Public Services and Consumer Affairs explained that the amended language "respond[ed] to *Grayson* by being more explicit about what kinds of suits the Council intends to authorize."  *See* Consumer Protection Act of 2012, Report on Bill 19-0581, at 4 (Nov. 28, 2012).  That Committee Report explains that subsection (k)(1)(D) "responds most directly to *Grayson* and the Committee's desire" to confer "maximum standing" to public interest organizations:

> Subparagraph (D) is intended to reach, for [public service organizations], the full extent of standing as may be recognized by the District of Columbia courts.  This may include bases for standing that . . . the D.C. courts have not yet had occasion to recognize . . . .  Subparagraph (D) is intended to explicitly and unequivocally authorize the court to find that a public interest organization has standing beyond what would be afforded under sub-paragraphs (A)-(C), beyond what would be afforded under a narrow reading of prior D.C. court decisions, and beyond what would be afforded in a federal case under a narrow reading of prior federal court decisions on federal standing.

*Id.* at 6.

This report demonstrates that the Council intended public interest organizations bringing suit under (k)(1)(D) to be free from any requirement to demonstrate their own Article III standing. Any contrary conclusion would defeat the Council's "explicit[]" and "unequivocal[]" intent for (k)(1)(D) to confer standing "beyond" what is afforded under (k)(1)(C). *Id.* It would likewise fall short of the Council's stated intention that (k)(1)(D) reach "the full extent of standing as may be recognized by the District of Columbia courts," where we have made clear that extent exceeds Article III's bounds where the Council so provides, as we conclude it did here.

Hormel counters that the legislative history favors its view because an earlier draft of the 2012 bill explicitly eliminated the injury-in-fact requirement for nonprofit organizations, yet the Council removed that provision from the final draft. But that earlier draft would have eliminated Article III strictures for *all* nonprofit organizations "regardless of whether or not the organization itself has suffered or would suffer an injury in fact." The excision of that clause came in conjunction with the addition of (k)(1)(D); that one-two punch effectively resurrected Article III barriers for generic nonprofits (which had been jettisoned in the earlier draft, as

Hormel points out) while carving out public interest organizations as the lone subset of nonprofits that are exempt from those strictures. That drafting history conforms to our view that the Council ultimately retained Article III restrictions in (k)(1)(C) suits, *supra* note 5, but carved out the subset of nonprofits that are public interest organizations as to whom those restrictions do not apply in (k)(1)(D).

In reaching a contrary conclusion, the trial court interpreted our precedents as holding that the CPPA does not modify Article III requirements, even after the 2012 amendments, citing *Stone v. Landis Construction Co.*, 120 A.3d 1287, 1289 (D.C. 2015), *Little v. Suntrust Bank*, 204 A.3d 1272, 1275 (D.C. 2019), and *Floyd v. Bank of America Corp.*, 70 A.3d 246, 251 (D.C. 2013). All of those cases concerned suits brought by individuals, and none purported to interpret (k)(1)(D)'s separate treatment of public interest organizations (or (k)(1)(C)'s treatment of the broader set of nonprofit organizations, for that matter). They are thus inapposite. The trial court also ascribed to the Council an "inten[t] and expect[ation]" that Article III apply to all CPPA actions, but it did so by quoting a section of the Committee Report dealing exclusively with (k)(1)(C). It did not consider the same Committee Report's section describing the purpose and scope of (k)(1)(D). As emphasized above, that section forcefully declares the Council's intent that (k)(1)(D) confer "maximum standing," "beyond" that conferred by (k)(1)(C).

The legislative history strongly points to the Council's intent, with respect to suits brought by public interest organizations under (k)(1)(D), to modify Article III standing requirements with a statutory test. Unlike in *Grayson*, we hold that intent is now sufficiently explicit.

**2.**

The next question is whether ALDF meets (k)(1)(D)'s statutory test. To do so, it needs to check three boxes: (1) it must be a public interest organization, D.C. Code § 28-3905(k)(1)(D)(i); (2) it must identify "a consumer or a class of consumers" that could bring suit in their own right, *id.*; and (3) it must have a "sufficient nexus" to those consumers' interests "to adequately" represent them, *id.* § (k)(1)(D)(ii). On the summary judgment record before us, ALDF checks all three boxes.[7]

---

[7] The parties agree that we review these legal questions de novo, though Hormel contends that we review factual findings necessary to the trial court's standing ruling for clear error. But Hormel does not identify any factual findings made at the summary judgment stage that warrant clear error review—the trial court did not conduct an evidentiary hearing regarding any factual issues related to standing—and we do not detect any. Of further note, Hormel does not suggest that determining whether a public interest organization has a sufficient nexus to the consumer interests involved is a discretionary call that we might review only for an abuse of discretion. We do not opine on that potential argument.

First, ALDF is a public interest organization, i.e., a nonprofit "organized and operating," at least in part, "for the purpose of promoting interests or rights of consumers," § 28-3901(a)(15). While ALDF's primary mission is to "protect the lives and advance the interest of animals," providing consumers with accurate information about how their meat is sourced is one of its subsidiary purposes. The undisputed evidence establishes that for more than a decade it has undertaken substantial efforts to ensure consumers have accurate information about how their meat is sourced—including by undertaking investigations, filing regulatory actions, and bringing or participating in other legal challenges—and it has broadly publicized the results of its efforts in order to educate consumers. As the trial court described it, ALDF advances its core mission through "public outreach, including educating consumers about the conditions and practices of factory farming." That evidence leaves no room for any genuine dispute about the fact that ALDF is organized and operating, in part, for the purpose of promoting consumer interests.

The trial court concluded otherwise, taking the view that ALDF is organized not to promote "the interests and rights of the consumers of Hormel meat products, but rather those of the consumed." Those interests are not mutually exclusive. ALDF believes that consumers will alter their meat purchasing and consumption habits if they are aware of the realities about how their meat is sourced. That it

advocates on behalf of consumers only in service of some predominant purpose of promoting animal welfare is not fatal to its suit. Purposes regularly fall short of end goals. For example, one's purpose for going to the gym might be to get in shape, even if doing so is only in service of some overarching goal(s) of living longer, attracting a partner, or the like. We start with the assumption the Council meant "purpose" in that ordinary sense—that people and organizations routinely have multiple purposes at once, some subservient to others. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language . . . and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). We have confirmation of that assumption here where the Council made clear that promoting the interests of consumers need only be "part" of a nonprofit's purpose, D.C. Code § 28-3901(a)(15), rather than its exclusive or even primary purpose.

Second, ALDF adequately identifies the class of consumers it seeks to represent as D.C. consumers who are targeted, and have been or will be misled, by Hormel's Natural Choice ads. Hormel does not argue that such a class is too indefinite or hypothetical to sue on behalf of; rather, it acknowledges that class of meat eaters as "the most obvious group of interested consumers" ALDF could

represent.[8]  It instead maintains that "ALDF did not raise th[e] argument" that it was suing on behalf of that class of consumers "below and thus waived it."  The record is to the contrary.  From the outset of its complaint, ALDF identified a substantial proportion of consumers who understood claims like "100% natural" as indicating qualities that were not true of Natural Choice meats.  The trial court stated its understanding in open court, several months before summary judgment motions were filed, that ALDF was seeking an injunction "for the consumers that ALDF is suing on behalf of, not for the organization," and Hormel's counsel responded, "[t]hat's the way I understood counsel's comments as well" and "we're fine with that."  The court verified with ALDF's counsel, who answered "Yes," it was suing on behalf of those consumers.  While ALDF additionally sought to maintain its suit on behalf of the general public under (k)(1)(C), that alternative ground for suit does not diminish the sufficiency with which it identified the class of consumers necessary to maintain a (k)(1)(D) suit.

---

[8] At points in its brief, Hormel attributes to the trial court a ruling that ALDF "had not identified which consumers it was purportedly representing."  We see no ruling like that in the order on appeal and Hormel does not provide any citation to where it believes the trial court made that finding.  What the trial court found was that (k)(1)(D) "does not apply" because ALDF lacked a sufficient nexus to the consumers of Hormel meat products to maintain its suit—ALDF promotes "not the interests and rights of the consumers of Hormel meat products, but rather those of the consumed."  The trial court expressed no confusion about the class of consumers ALDF sought to represent, and nowhere did it conclude that ALDF had insufficiently identified that class.

Third, ALDF has a "sufficient nexus" to the group of consumers it identified. This requirement is an "important limit[]" that functions to ensure that an "organization has a sufficient stake in the action" to pursue it "with the requisite zeal and concreteness." Committee Report, at 6. ALDF has a sufficient stake in those consumer interests here, and neither the trial court nor Hormel has questioned its aptitude or zeal in prosecuting this suit. As the trial court found, ALDF has long sought to ensure that meat-eating consumers have "accurate information about factory farming conditions and practices" so they can make more informed decisions about meat consumption, with the intended result of reducing demand for factory-farmed products. This work continues ALDF's decades-long history of advocacy and legal action designed to promote consumers' interest in "truth in meat and poultry advertising."

Hormel counters that ALDF does not advance the interests of meat consumers because ALDF "would be happiest if consumers stopped eating meat entirely," rendering ALDF's interests "antagonistic" to those of meat consumers. We disagree. There is nothing inconsistent about seeking to eliminate meat consumption while ensuring meat eaters have accurate information available to them when making their purchasing decisions. ALDF views the latter as a means to, or at least an incremental step toward, the former. Its immediate objectives include combatting

false and misleading claims about how meat is produced, and those goals align with consumers' interests in truthful advertising. Hormel further contends that its consumers "care about whether their meat is tasty, natural, and protected against spoiling without preservatives," while "ALDF cares about none of those things." That is not true, as ALDF cares about whether the meat is "natural" in one sense of the word that consumers may also care about.[9] Moreover, at least some meat consumers also care about ethical considerations regarding the conditions in which animals are raised and slaughtered, as evidenced by Hormel's own insistence that it "humanely raises and slaughters the animals used in its products." There is no genuine dispute that ALDF has a strong interest in shedding light on those ethical considerations, putting it in sufficient alignment with that class of meat-eaters who likewise care about them.

**3.**

---

[9] The parties each usher substantial evidence, sufficient to create a dispute of material fact, as to what consumers understand the word "natural" to convey. How a reasonable consumer might understand the term is a question of fact unfit for resolution on summary judgment on this record. *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 444-45 (D.C. 2013) (the determination of whether a consumer disclosure notice was "misleading" under the CPPA is "a question of fact for the jury and not a question of law for the court").

Hormel argues that ALDF forfeited its argument for statutory standing under (k)(1)(D) because it did not specifically plead that provision as a basis for standing in its complaint. Hormel raised this objection in the trial court, which either rejected it sub silentio or simply neglected to address it; it skipped over the point and considered whether standing was in fact proper under (k)(1)(D). In either case, we see no grounds for finding this argument forfeited. The facts alleged in the complaint support a (k)(1)(D) theory of standing, and Hormel had sufficient opportunity to develop and dispute those facts, which were similarly relevant to ALDF's expressly pled claim of organizational standing.

ALDF's complaint, in its statement of jurisdiction, stated simply that the trial court had "subject matter jurisdiction over this action under the D.C. CPPA, D.C. Code § 28-3901, *et seq.*" That alone, considered alongside the extensive factual allegations in the 42-page complaint, would seem to comply with Rule 8's requirement for "a short and plain statement of the grounds for the court's jurisdiction." Super. Ct. Civ. R. 8(a)(1). But Hormel accuses ALDF of a bait-and-switch, because its complaint does (on its penultimate page) expressly invoke (k)(1)(C), but not (k)(1)(D), as a basis for standing. ALDF did not expressly invoke (k)(1)(D) until its summary judgment motion, and then again in its opposition to

Hormel's summary judgment motion. That was too late in the day, Hormel argues, so we should treat this basis for standing as having been forfeited. We disagree.

Contrary to Hormel's sweeping view that specific legal theories are forfeited unless they are pled, we have held that "complaints need not plead law," nor do they have to "match facts to every element of a legal theory." *Chamberlain v. American Honda Fin. Corp.*, 931 A.2d 1018, 1023 (D.C. 2007) (quoting *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000)). We have rejected the opposing view, in a CPPA case no less, that plaintiffs must in their complaints "cite the specific subsections of the CPPA" that they are invoking, reasoning that "matching allegations of the complaint to corresponding subsections of the CPPA is a straightforward task." *Velcoff v. MedStar Health, Inc.*, 186 A.3d 823, 827 (D.C. 2018); *see also Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) (Plaintiffs are "not required to plead legal theories," and "[e]ven citing the wrong statute needn't be a fatal mistake, provided the error is corrected in response to the defendant's motion for summary judgment. . . .").

The authority Hormel principally relies upon does not support dismissal here. *See La Asociacion de Trabajadores v. City of Lake Forest*, 624 F.3d 1083, 1088-89

(9th Cir. 2010).[10] *Trabajadores* affirmed a dismissal for lack of standing only after specifically highlighting how the plaintiff "failed to assert any factual allegations in its complaint" that would support the theory of standing pressed at the summary judgment stage. *Id.* at 1088. Were we to adopt that same approach—in some tension with our precedents that "a trial court's jurisdictional inquiry under 12(b)(1) may extend beyond the facts pled in the complaint"[11]—we would still have no cause to find this basis for standing forfeited because the complaint here did allege adequate facts to support a (k)(1)(D) theory of standing. *Trabajadores* "is simply not relevant" where the plaintiff "pleaded sufficient facts to support his argument on

---

[10] The only additional authority Hormel cites is the view of a single judge in *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 286 n.57 (3d Cir. 2014), though it mistakenly cites that as a majority opinion when it "represents only the views of Judge Greenberg." *Id.* at 282 n.52. It is an understandable and easy mistake to make, given that after announcing the section expressed his views alone, Judge Greenberg deployed the royal "we"—"We emphasize," "we state," *id.* at 285-86, nn.56-57— after previewing that he was doing so as "a matter of convenience." *Id.* at 282 n.52. Yet even Judge Greenberg did not endorse Hormel's sweeping rule, caveating that he rejected the view "that a plaintiff never can cure a pleading with respect to a standing issue in response to a motion for summary judgment challenging its standing," instead emphasizing the "circumstances of this case" as leading to his conclusion that plaintiff CBP lacked standing. *Id.* at 286 n.57. The other members of the panel disagreed with that conclusion. *Id.* at 282 n.52.

[11] *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 43 (D.C. 2015); *see also Grayson*, 15 A.3d at 232 n.8 ("[I]t has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'") (citations omitted).

summary judgment." *Muffett v. City of Yakima*, No. CV-10-3092-RMP, 2012 WL 2915472, at \*5 (E.D. Wash. July 17, 2012).

The complaint's allegations in this case substantiated each of the three critical components of (k)(1)(D) standing: (1) that it is a public interest organization organized and operating, in part, to advance consumer interests; (2) that it has a sufficient nexus to those consumers' interests to adequately represent them; and (3) that there is a class of D.C. consumers who eat meat and were targeted by Hormel's Natural Choice ads (and further substantiating its view that they were likely to be misled by claims like "100% natural"). *See* D.C. Code §§ 28-3901(a)(15), 28-3905(k)(1)(D).

As to the first point, ALDF alleged it "is a national non-profit organization" "[a]dvocating for transparency in the meat industry and truth in meat and poultry advertising is central to ALDF's mission."[12] As to the second and related point, its

---

[12] It provided two reasons that such transparency is central to its mission: "First, disseminating truthful information about the cruelties suffered by animals on factory farms . . . leads consumers to boycott and buy less meat from such sources, resulting in fewer animals being raised and slaughtered in terrible conditions. Second, false and misleading meat advertising perpetuates animal suffering by distorting the marketplace, injuring both more natural, humane competitors who spend money improving the welfare and living conditions of farmed animals, and

complaint describes the organization's long history of advocacy on "consumer safety" issues, promoting "transparency in the meat industry," and "educating consumers" of meat-based products "about the truth behind meaningless and misleading labels and advertising by meat companies." It also detailed how ALDF devoted "substantial" "resources to counteract the misinformation" of Hormel's Natural Choice campaign, "educating consumers about this and other 'natural' claims, advocating for stronger standards for the 'natural' claim that fall in line with consumer expectations, and publicizing the truth about Hormel's farming practices." As to the third point, ALDF alleged that "Hormel aims its 'Make the Natural Choice' advertising campaign at the District of Columbia," and that its "consumers are concerned about how animals are raised . . . and the nature of any additives." It further detailed how "most consumers believe that 'natural' means that the animals were not subject to industrial, pharmaceutical-driven factory farm conditions" and how "it is material to consumers that animals not be subject to factory-farm conditions."

Hormel was not unfairly prejudiced by ALDF's delay in pinpointing the (k)(1)(D) theory of standing where each of the above factors is likewise relevant to

---

the consumers who desire to patronize these farms and rely on companies' representations when making their purchases."

the organizational theory of standing expressly identified in ALDF's complaint. The organizational theory of standing required ALDF to demonstrate that Hormel's ads posed a "direct conflict" to its organizational mission. *See infra* Part II.B. That inquiry substantially overlaps with the questions whether ALDF is a public interest organization and whether it has a sufficient nexus to the consumers it was seeking to represent. Hormel issued many discovery requests addressed to those (k)(1)(D) concerns. In one interrogatory, it asked ALDF to "[i]dentify all of [its] organizational activities related to '[a]dvocating for . . . truth in meat and poultry advertising,' including advertising claims unrelated to animal welfare." In another, Hormel asked ALDF to "[d]escribe in detail each of ALDF's 'petitions, campaigns, lawsuits, and outreach efforts to address misleading meat and poultry . . . advertising.'" ALDF responded to each query at length, over more than twenty combined pages of responses. Hormel also asked ALDF's Chief Programs Officer, Mark Walden, whether Hormel's product claims "conflict with ALDF's organizational mission." He responded in detail about how, when it comes to meat products, "truth in advertising" goes "to the core" of ALDF's mission to advance the interests of animals through the legal system. Given this record, we do not see any way in which ALDF's failure to cite (k)(1)(D) in its complaint prejudiced Hormel.

In a distinct line of attack, Hormel asserts that ALDF used the absence of a (k)(1)(D) theory in its complaint as a shield to "oppose federal jurisdiction" so that it should not be permitted to switch tactics now. We disagree. ALDF never disclaimed (k)(1)(D) standing in its effort to remand the action from federal court after Hormel had removed it under the Class Action Fairness Act (CAFA). ALDF maintained only that it was not bringing a Rule 23 class action under CAFA because it was seeking injunctive relief rather than monetary damages. *See Rotunda*, 123 A.3d at 989 (holding that even under the CPPA "the necessary vehicle for suits seeking class-wide damages remains Rule 23"); *see generally* Super. Ct. Civ. R. 23. That was true then and it remains true now. The federal court agreed and remanded this case for lack of subject matter jurisdiction on that precise basis: "[c]lass action jurisdiction under CAFA . . . [did] not apply in this case seeking injunctive relief," where no damages were sought. *Animal Legal Def. Fund v. Hormel Foods Corp.*, 249 F. Supp. 3d 53, 65 (D.D.C. 2017).[13]

---

[13] Hormel also asserts that ALDF refused to answer questions about its contacts with consumers on the ground that it was pursuing only an organizational theory of standing. There is limited support for that allegation in the record, but the evasion Hormel complains of was minimal when compared to the number of lengthy and responsive answers ALDF provided bearing on (k)(1)(D) standing and provides no basis to find ALDF forfeited this theory of standing.

We reject Hormel's contention that ALDF forfeited its claim of (k)(1)(D) standing and conclude that ALDF established as a matter of law that it has standing to maintain its suit.

## B.

ALDF also challenges the trial court's ruling that it did not have organizational standing under Article III as is necessary to maintain suit under § 28-3905(k)(1)(C). *See supra* note 5. Subsection (k)(1)(C) of D.C. Code § 28-3905 permits any nonprofit organization to bring suit on behalf of the general public, so long as the suit is also brought on behalf of itself or its members. As explained above in note 5, this provision requires ALDF to satisfy traditional Article III standing requirements. ALDF argues that it carries that burden under a theory of organizational standing. *See generally Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *D.C. Appleseed Ctr. for Law & Just., Inc. v. D.C. Dep't of Ins., Sec., and Banking*, 54 A.3d 1188, 1205-11 (D.C. 2012). It also argues that, in concluding to the contrary, the trial court erroneously excluded from its consideration certain evidence under the "sham affidavit" doctrine. We do not resolve these arguments because, having found ALDF has standing to maintain its

suit under (k)(1)(D), it is unnecessary to resolve whether ALDF also meets the traditional Article III requirements applicable to (k)(1)(C) suits.

## III.

Finally, we address whether ALDF's claims are preempted by federal labeling laws, as the trial court concluded. We note at the outset that the trial court, having found a lack of standing, should not have reached the question. When the plaintiff lacks standing, the court lacks jurisdiction. *UMC Dev.*, 120 A.3d at 43 (a lack of standing is "a defect in subject matter jurisdiction"). "Without jurisdiction the court cannot proceed at all in any cause," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), and the "only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868). Nonetheless, having found that ALDF does in fact have standing to bring its suit, *supra* Part II.A, we are left to confront the question whether ALDF's CPPA claims are preempted by federal labeling laws. We review that question of law de novo. *Murray v. Motorola, Inc.*, 982 A.2d 764, 769 (D.C. 2009).

The Supremacy Clause of Article VI provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. From

that authority, Congressional acts may preempt state law, as well as District law.[14]
*Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).   They can do so either expressly or impliedly.  *Unum Life Ins. Co. of Am. v. District of Columbia*, 238 A.3d 222, 226 (D.C. 2020).  Here, Hormel argues that the Federal Meat Inspection Act (FMIA) and the Poultry Products Inspection Act (PPIA) impliedly preempt ALDF's CPPA suit because suits like these, if allowed to go forward, would serve "as an obstacle to Congress's intent to establish reliable, uniform descriptions of meat products" under those acts.  *See id.* at 226-27 (obstacle preemption may apply "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (internal quotations omitted).

Hormel's thesis is that the FMIA and PPIA prohibit "false or misleading" labeling, 21 U.S.C. §§ 457(c), 607(d), and the USDA has already approved the Natural Choice labels, including their claims of "natural," "no preservatives," and the like as compliant with that restriction.  *See* 9 C.F.R §§ 412.1, 412.2.  By

---

[14] While the District is generally treated like a state for preemption purposes, *Goudreau v. Standard Fed. Sav. & Loan Ass'n*, 511 A.2d 386, 389 n.4 (D.C. 1986), there is a wrinkle.  Because some District laws were passed by Congress, preemption analysis does not apply where Congress enacted both of the "statutes allegedly in conflict."  *P&Z Co. v. District of Columbia*, 408 A.2d 1249, 1251 (D.C. 1979).  That wrinkle has no bearing here, where the CPPA was passed by the D.C. Council.

approving the labels, the argument goes, the USDA necessarily found those descriptions were neither false nor misleading, thereby precluding states from revisiting that conclusion. The trial court agreed. "[A]pplying the CPPA to prohibit the use of [those] terms," it determined, "would stand as an obstacle to the accomplishment" of FMIA and PPIA's objectives of "consistent regulation of labeling of meat and poultry products."

We disagree. States are free to regulate advertisements without regard to whatever terms the USDA approves as appropriate for labeling, so long as they do not encroach on the labeling itself. As always, "we start with the assumption" that Congress did not intend to override "the historic police powers of the States." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up); *accord Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). That assumption applies to the District's police powers just as it does to the States'. *Asylum Co. v. District of Columbia Dep't of Emp't Servs.*, 10 A.3d 619, 631 (D.C. 2010); *In re Estate of Couse*, 850 A.2d 304, 308 (D.C. 2004). It is a particularly sturdy assumption when the proponent of preemption (here, Hormel) asserts that Congress encroached on "a field which the States have traditionally occupied," *Medtronic*, 518 U.S. at 485, like the regulation

of advertising. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144 (1963) ("States have always possessed a legitimate interest in the protection of their people against fraud and deception in the sale of food products . . . within their borders.") (internal quotations and alterations omitted); *Farm Raised Salmon Cases*, 175 P.3d 1170, 1176 (Cal. 2008) ("Laws regulating the proper marketing of food, including the prevention of deceptive sales practices," are traditionally a domain of the states).  The presumption can be overridden only by a "clear and manifest purpose of Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

We see nothing in the FMIA or PPIA suggesting Congress meant to limit states' (or the District's) traditional powers to regulate advertising. *See Medtronic*, 518 U.S. at 485 (congressional purpose is "the ultimate touchstone").  "While it is true that the FMIA prohibits states from imposing '[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those' mandated under the FMIA, 21 U.S.C. § 678, nothing in the text of the FMIA indicates an intent to preempt state unfair-trade-practices laws in general." *United States v. Stanko*, 491 F.3d 408, 418 (8th Cir. 2007).  That is equally true of PPIA.

Unlike federal statutes that broadly regulate "unfair or deceptive acts or practices"[15]—or those explicitly regulating "labeling *and advertising*"[16]—neither the PPIA nor the FMIA says anything at all about advertising beyond the labeling itself. *See* 21 U.S.C. §§ 451, 602. In enacting the FMIA and PPIA, Congress explained its purpose as ensuring that meat and poultry products are "properly marked, labeled, and packaged." 21 U.S.C. §§ 451, 602. Each Act includes an express preemption provision—substantively identical for our purposes— prohibiting "any State . . . or the District of Columbia" from imposing any "[m]arking, labeling, packaging, or ingredient requirements . . . in addition to, or different than, those made under this chapter." 21 U.S.C. §§ 467e, 678. But as Hormel acknowledges, ALDF's lawsuit does not seek to impose a novel labeling requirement on Hormel's products. It takes aim solely at Hormel's advertisements that go beyond labeling. For that reason, neither FMIA nor PPIA's express preemption provision speak directly to the issue at bar.

Because of this congressional silence, Hormel faces an uphill battle to show that Congress evinced a clear and manifest intent to preempt state laws regulating

---

[15] *E.g.*, Federal Trade Commission Act, 15 U.S.C. §§ 45(a)(2), 57a(a)(1).

[16] *E.g.*, Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331 *et seq*.

advertising that do not encroach on labeling itself. *ARC Am. Corp.*, 490 U.S. at 101; *see also Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 607 (1991) ("[m]ere silence" generally "cannot suffice"). In fact, the existence of these express preemption clauses suggests that Congress put its mind to the precise scope of FMIA and PPIA's preemptive effect, and deliberately left states' traditional regulation of advertising unimpeded. In other words, Congress's silence "supports a reasonable inference" that, in passing the Acts, it had no desire to preempt states' regulation of advertising. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995).[17] As does the fact that, when Congress amended the Acts to include express preemption clauses in 1967 and 1968, respectively,[18] states throughout the nation already had robust regimes regulating advertising. *See generally* Note, *The Regulation of Advertising*,

---

[17] *See also Empacadora de Carnes de Fresnillo v. Curry*, 476 F.3d 326, 334 (5th Cir. 2007) ("[T]he FMIA contains a narrow . . . labeling preemption clause, and Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 327 (2008) ("Congress could have applied the pre-emption clause to the entire [Food, Drug, and Cosmetic Act]. It did not do so, but instead wrote a pre-emption clause that applies only to medical devices."). That said, we agree with Hormel that the existence of an express preemption provision does not impose a "'special burden' that would make it more difficult to establish the preemption of laws falling outside the clause." *Arizona*, 567 U.S. at 406. The burden is the same; we simply find support for our appraisal of congressional intent in the rather narrow express preemption provisions.

[18] *See* Pub. L. 90-201, 81 Stat. 584 (Dec. 15, 1967) (FMIA); Pub. L. 90-492, 82 Stat. 792 (Aug. 18, 1968) (PPIA).

56 COLUM. L. REV. 1018, 1058 (1956) (describing "the adoption, in forty-three states, the District of Columbia and Hawaii, of more or less uniform statutes designed to punish 'untrue, deceptive, or misleading' advertising"); *see also, e.g.*, D.C. Code §§ 22-1411, 22-1413 (1916); 21 Okla. Stat. § 1502 (1919); Cal. Bus. & Prof. Code §§ 17535 (1941), 17536 (1965); N.Y. Gen. Bus. Law § 350 (1963).

Given such pervasive and longstanding state regulatory schemes, Congress must have been "aware[] of the prevalence of" those regimes. *Wyeth*, 555 U.S. at 575; *see Collins v. United States*, 631 A.2d 48, 51 (D.C. 1993) (Congress is "presumed to know the law" when it acts) (alterations and citation omitted). "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have" expanded PPIA and FMIA's "express pre-emption provision[s] at some point" in the 50-plus years since it enacted them. *Wyeth*, 555 U.S. at 574; *accord Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1677 (2019). It would not leave that enormous policy implication to an (in our view unsupported) inference that whatever claims pass USDA scrutiny for labeling purposes are necessarily fair game to broadcast in all manner of advertisements, with the states having nothing whatsoever to say about it.

The Supreme Court's decision in *Wyeth* is illuminating. In that case, the plaintiff sued a pharmaceutical company for failing to warn patients about the drug's risk of causing gangrene. 555 U.S. at 559-60. The company countered that her suit was impliedly preempted because the Food and Drug Administration had approved the drug's warning labels, and to allow the adequacy of those labels to be second-guessed through state tort suits would create an intolerable obstacle to the accomplishment of federal labeling law. *Id.* at 563-64. The Court disagreed, finding no evidence that Congress wished to preempt state-law challenges to the adequacy of drug labeling. *See id.* at 573. As support for that conclusion, the Court noted that Congress had passed an express preemption provision that applied only to "medical devices," but had "not enacted such a provision for prescription drugs." *Id.* at 574 (citing 21 U.S.C. § 360k). It stressed Congress's "certain awareness" of pervasive state law regimes permitting suits for deceptive labeling, *id.* at 574, and the "decades of coexistence" between those state laws and the federal regulation of drug labeling, *id.* at 578, as compelling evidence against finding an implied preemption of such state suits. "The case for federal pre-emption is particularly weak," it reasoned, where Congress is aware "of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Id.* at 575 (citation omitted). Given Congress's equivalent silence on meat and poultry advertising—despite inapplicable express

preemption clauses and robust state regulation—the case for implied preemption is equally deficient here.

Hormel attempts to distinguish *Wyeth* on the ground that the Food, Drug, and Cosmetic Act, at issue in that case, differs from FMIA and PPIA in an important respect. Unlike the FMIA and PPIA, the FDCA permits drug companies to unilaterally change their product labels, and the Supreme Court has held that state suits may yet be preempted where the drug manufacturer "fully informed the FDA of the justifications for the warning required by state law and [] the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning." *Merck Sharp*, 139 S. Ct. at 1678. The distinction is of no help to Hormel. *Wyeth* did not rely on this feature in rejecting the manufacturer's obstacle preemption claim. *See Wyeth*, 555 U.S. at 573-78. It mentioned it in reference to a claim of "impossibility preemption," *id.* at 570, 573— as did *Merck Sharp* a decade later, 139 S. Ct. at 1678—where it would literally be impossible to comply with both the state and the federal schemes. Hormel has not raised the specter of impossibility preemption in this case, nor could it. It is perfectly possible for Hormel to comply with federal labeling laws and the CPPA even if ALDF's suit is ultimately found to be meritorious: (1) it can cease advertising the offending products altogether, (2) it can submit a new label for approval to the

USDA sans the offending claims, and there is no suggestion here that the USDA would not, if asked, approve labels minus the allegedly misleading descriptors, and (3) it may yet be able to run adverts consisting "entirely of a picture of the approved product label"—though Hormel contends this adverse preemption ruling would leave even that prone to a non-preempted attack—a question that is not presented by this case. Hormel also tries to distinguish *Wyeth* on the basis that the FDCA's legislative history "indicate[s] that it was not intended to preempt state failure-to-warn claims." That is no point of contrast, however, as the FMIA and PPIA's legislative history likewise reveals no intention to preempt state consumer protection claims.

It is thus unsurprising that the majority of federal courts addressing the issue agree that these federal labeling laws do not preempt state efforts to regulate advertising. *See, e.g.*, *Organic Consumers Ass'n v. Sanderson Farms*, 284 F. Supp. 3d 1005, 1014 (N.D. Cal. 2018) (addressing "100% Natural" claims and noting that "language that is technically and scientifically accurate on a label can be manipulated in an advertisement to create a message that is false and misleading to the consumer") (internal quotations omitted); *Sanderson Farms v. Tyson Foods*, 549 F. Supp. 2d 708, 720 (D. Md. 2008) (PPIA and FMIA do not govern "non-label advertising" of meat products, including whether such ads are "false or misleading");

*cf. In re Bayer Corp.*, 701 F. Supp. 2d 356, 376 (E.D.N.Y. 2010) (statements "could still be misleading under state law" even if they "met the FDA's threshold requirements" for labeling).[19]  Advertisements beyond mere labels give manufacturers a broader platform to exaggerate their products' positive attributes and trivialize its less flattering ones.  There is thus nothing incongruous about Congress demanding national uniformity in labeling, while leaving states to police advertising that extends beyond labeling.

The Ninth Circuit crystallized the point in *Nat'l Broiler Council v. Voss*, 44 F.3d 740 (9th Cir. 1994).  There, three trade associations sued to invalidate a section of the California Food and Agricultural Code prohibiting wholesalers from using the word "fresh" on poultry labels and advertisements unless the poultry had been stored at 26° Fahrenheit or higher.  *Id.* at 743.  The labeling provision, the court found, imposed a requirement "in addition to" and "different than" PPIA's mandates, and thus violated the Act's express preemption provision.  *Id.* at 745-47 (citing 21 U.S.C. § 467e).  The court thus affirmed the district court's order striking down California's *labeling* restrictions as preempted.  *Id.* at 749.  But critically important here, the court

---

[19] The only contrary authority relied on by the trial court, which Hormel likewise advances here, is *Phelps v. Hormel Foods Corp.*, 244 F. Supp. 3d 1312, 1317 n.2 (S.D. Fla. 2017).  For all the reasons above, we find it unpersuasive.

rejected the plaintiffs' contention that the labeling provisions' invalidity infected the entire statute—including its restriction on advertising—and the court reversed the district court's contrary conclusion. *Id.* at 748-49. There was no tension in those rulings, Judge O'Scannlain explained in his concurrence, because "California stores can still be required by state law to tell the truth in advertising and to display frozen chickens for what they are—'frozen'—even though the labels on the chickens themselves are required by federal law to say 'fresh.'" *Id.* at 749 (O'Scannlain, J., concurring). "[T]he States are not without devices of their own to protect their citizens" just because "Congress permits the federal bureaucracy to impose" labeling requirements. *Id.* The same goes here. We hold that ALDF's CPPA suit is not preempted by the FMIA or PPIA.

*          *          *

For the foregoing reasons, the judgment of the Superior Court is reversed and the matter is remanded for further proceedings consistent with this opinion.

*So ordered.*